Michael Wayne **HALL**, Appellant,

v.

The **STATE** of Texas.

No. 73,787.

Court of Criminal Appeals of Texas.

Jan. 16, 2002.

Rehearing Denied March 13, 2002.

Danny D. Burns, Fort Worth, for Appellant.

Helena F. Faulkner, Asst. DA, Fort Worth, Matthew Paul, State's Atty., Austin, for State.

## OPINION

KEASLER, J., delivered the opinion of the Court joined by KELLER, P.J., and MEYERS, WOMACK, HERVEY, and COCHRAN, J.J.

Michael Hall was convicted of capital murder and sentenced to death.[1] Direct appeal to this Court is automatic.[2] Hall raises thirteen points of error including a challenge to the sufficiency of the evidence supporting the jury's finding on the article

---

1. Tex. Penal Code Ann. § 19.03(a); Tex.Code Crim. Proc. art. 37.071, § 2(g). Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

2. Art. 37.071, § 2(h).

37.071 section 2(b) punishment issue.[3] We find Hall's claims meritless and affirm the judgment of the trial court.

## STATEMENT OF FACTS

Eighteen-year-old Hall and his friend Robert Neville decided to kill someone because Hall was angry that he had a "sucky-ass" life. They started searching for the right victim and preparing for their crime by obtaining rifles, pellet guns, a crossbow, and ammunition. After much looking, Hall and Neville finally chose nineteen-year-old Amy Robinson, a friend and former coworker, because she trusted them and they "didn't have to put bruises on her to get her in the car." The evidence also revealed that Amy had a genetic disorder that made her small and mentally and physically slow. She stood four feet five inches tall and had the mental capacity of a third or fourth grader.

On February 15, 1998, Hall and Neville went looking for Amy in order to carry out their murderous plan. They checked her schedule at the Kroger grocery store and then lay in wait for her to ride by on her bicycle on her way to work. When the pair saw Amy, they coaxed her into the car, promising to drop her at work after they circled around in the country. As Neville drove, Amy complained that she did not want to be late for work.

Neville then pretended to have a flat tire and pulled the car over on a dirt road by a remote field. Hall and Neville got out of the car and walked into the field carrying their weapons while an unsuspecting Amy waited in the car listening to the radio. At some point, Hall persuaded Amy to get out of the car, telling her she needed to go talk to Neville near a tree. As Amy walked toward Neville, he fired a crossbow at her several times. Neville missed each shot,

but Amy became angry when the last arrow grazed her hair. When Amy started walking back to the car, Hall shot her in the back of her leg with his pellet gun. Hall and Neville laughed while Amy cried in pain.

Meanwhile, Neville returned to the car and got his .22 caliber rifle. When Hall managed to maneuver Amy back into the field, Neville shot her in the chest. Hall then shot her in the chest "three or four or six times" with the pellet gun. Amy fell to the ground making loud noises and shaking. Hall then stood over her and stared for five to ten minutes. The pair worried that someone would hear Amy, so Neville shot her in the head, killing her instantly. Hall and Neville then left Amy and her bicycle in an area where they would not be easily discovered.

A few days later, they returned to the scene. Neville fired shots into Amy's dead body, and Hall took keys and money from her pocket. When Amy's family and coworkers realized she was missing, a massive search ensued. More than two weeks later, authorities focused on Hall and Neville. Fearing they would be caught, the pair fled Arlington but were soon arrested when they attempted to cross the border into Mexico. The authorities found Amy's body on the day of the arrest.

## SUFFICIENCY OF THE EVIDENCE AT PUNISHMENT

 In his sixth point of error, Hall claims that the evidence presented at trial was legally insufficient to support the jury's finding that he would be a continuing threat to society.[4] In reviewing the sufficiency of the evidence at punishment, we look at the evidence in the light most favorable to the verdict. We determine

---

3. *See* Art. 37.071, § 2(b).

4. *See* Art. 37.071, § 2(b)(1).

whether any rational trier of fact could have believed beyond a reasonable doubt that Hall would probably commit criminal acts of violence constituting a continuing threat to society.[5] The facts of the crime alone can be sufficient to support the affirmative finding to the special issue.[6] Additionally, we have consistently defined "society" as encompassing both the prison population and the free population.[7]

The facts of this case support the jury's affirmative finding that Hall would continue to be a threat. The evidence did not show a hastily conceived murder plan, but a methodical, premeditated scheme. In addition, once Hall and Neville had made their plans and chosen their mentally challenged victim, they taunted and tormented her, reveling in her confusion and agony. Finally, Hall boasted in his media interview that he was the one who got Amy to trust him, and she would have escaped had Neville tried to commit the offense without him. Indeed, Hall told the media that he had no remorse for Amy's death. When asked how he felt about Amy dying the way she did, Hall snickered, "Well, I wouldn't want to be in her place. She had to take a lot of pain." After his arrest, Hall told law enforcement and the media that he and Neville had wanted to become serial killers and kill one to five people a week. They also wanted to become white supremacists and kill African Americans.

In addition to the facts of the crime and the circumstances surrounding Hall's arrest, the State presented evidence that Hall told one of his teachers about violent fantasies he had about injuring others. Hall also admitted to the defense psychologist that he had violent, demonic, bloody dreams, which the psychologist testified was common for potential killers. The State's psychologist testified that there was no indication that Neville had duped Hall into committing this crime.

A rational jury could reasonably have concluded that Hall would continue to be a threat to society, given the facts of the case and the psychological evidence. Accordingly, we hold the evidence legally sufficient to support the jury's affirmative answer to the future dangerousness issue. Point of error six is overruled.

## ADMISSION OF VIDEOTAPED STATEMENT

■ In his first five points of error, Hall claims that the trial court erred in admitting into evidence a videotaped statement he gave to reporters. Specifically, in his first two points of error, Hall complains that the admission of this statement violated both due process and the effective assistance of counsel under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, sections 10, 14, 19, and 29 of the Texas Constitution.

■ Hall offers no reason for construing the Texas Constitution as conferring greater protection in this area of law than the federal constitution. Therefore, we will not address his state constitutional arguments.[8] Hall also fails to distinguish between his rights under the Fifth Amend-

5. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Allridge v. State,* 850 S.W.2d 471 (Tex.Crim.App.1991), *cert. denied,* 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993).

6. *Allridge,* 850 S.W.2d at 488.

7. *See Griffith v. State,* 983 S.W.2d 282, 288 n. 9 (Tex.Crim.App.1998), *cert. denied,* 528 U.S. 826, 120 S.Ct. 77, 145 L.Ed.2d 65 (1999).

8. *See Muniz v. State,* 851 S.W.2d 238, 251–52 (Tex.Crim.App.1993), *cert. denied,* 510 U.S. 837, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993); *Heitman v. State,* 815 S.W.2d 681, 690–91 n. 23 (Tex.Crim.App.1991).

ment and those under the Sixth Amendment. So, we will assume that Hall had been formally charged at the time of the media interview, and we will combine our analysis of these points.

 In *Maine v. Moulton,*[9] the United States Supreme Court re-emphasized that after the initiation of formal charges, the Sixth Amendment guarantees the accused the right to rely on counsel as a "medium" between the State and the accused. This guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right. The Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.[10]

During a pre-trial hearing on a motion to suppress the complained-of statement, the television reporter who conducted the interview testified that she and a television photographer went to the sheriff's office early that morning and talked to deputies about her desire to interview Hall and his co-defendant. The sheriff was not in the office at the time so they were told to come back later. When the two returned shortly before lunch, the sheriff informed the reporter that her request would be presented to Hall and Neville and that she should check back later. A Fort Worth newspaper reporter and a newspaper photographer were also at the sheriff's office at that time and made a similar request to interview the suspects.

When the television reporter and photographer returned to the office, a deputy came out holding a note which he indicated

was a signed consent to the reporter's request for an interview. But, the reporter stated that she had not written such a note. Upon request, she then wrote a note to the suspects with her request for an interview. A deputy took it to them and told them that they could sign the request or not. Both signed. It is not clear who generated the first written request.

The two reporters and the two photographers were directed to an interview room with a counter and fencing separating them from the suspects' seating area. Neville and Hall were then interviewed separately. Both reporters testified at the hearing that no authority ever suggested that they conduct the interview, nor did authorities suggest any questions for them to ask the suspects. Both reporters also testified that they did not provide authorities with copies of their resulting interviews.

We find no evidence that the authorities prompted the interview. We conclude that the reporters were not acting as state agents when they conducted the interviews and Hall's rights were not violated when the evidence was presented at trial. Points of error one and two are overruled.

 In his third point, Hall argues that the trial court erred in admitting the videotape because it showed him in "a cage" and therefore, "reversed his right to be presumed innocent" under the due process clause of the federal and state constitutions. But Hall did not object on this basis at trial. To preserve a complaint for appellate review, the record must show that the complaint was made to the trial court.[11] Here, it does not. Hall's third point of error is overruled.

---

9. 474 U.S. 159, 176, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985).

10. *Id.*

11. Tex.R.App. P. 33.1.

■ Hall claims in point four that the prejudicial effect of the tape "clearly outweighed" any probative value the tape might have had in violation of Texas Rules of Evidence 401 and 403. The trial court has broad discretion in conducting a Rule 403 balancing test, and we will not lightly disturb the decision rendered.[12]

In this case, the videotape's probative value was that it allowed the jury to see Hall's behavior and hear his rendition of the facts of the offense firsthand. These are also the factors which make the evidence prejudicial. But we find that the videotape simply reflects the reality of the crime committed and Hall's lack of remorse. In short, the prejudicial effect of this evidence comes from nothing more than what Hall himself has done. He cannot successfully say, "You must not be outraged by my outrageous behavior."

For otherwise relevant evidence to be excluded under Texas Rule of Evidence 403, the record must show that the danger of unfair prejudice substantially outweighs the probative value of the complained-of evidence. This videotape, though prejudicial, was not unfairly so. The trial judge did not abuse his discretion in overruling Hall's objection. Point of error four is overruled.

■ Finally on this issue, Hall complains that a duplicate version of his videotaped statement that had been edited by the Tarrant County District Attorney's office was not properly authenticated under Texas Rule of Evidence 1003. The Rule provides that a duplicate is admissible to the same extent as an original unless a question is raised as to the authenticity of the original or in the circumstances it would be unfair to admit the duplicate in lieu of the original.

Hall argues that the edited copy of the tape had been created in a manner that was "orchestrated for the greatest theatrical effect" and that the questions and the order of the answers from the original tape were changed. The edited version of the tape was admitted into evidence at the guilt-innocence phase of the trial, while an unedited version of the tape was admitted into evidence at punishment.

During the pre-trial suppression hearing, the television reporter stated that she watched the entire taped interview as it was being duplicated. She testified that the unedited duplicate tape accurately reflected her memory of the interview with Hall which she had personally conducted. The television reporter also stated that she had watched the edited tape, and except for some portions of the interview being deleted and other portions being rearranged, it also accurately reflected the events of the interview. Although the newspaper reporter had not participated in the copying or editing of the videotape, he also testified that both tapes accurately reflected what had occurred during the live interview.

After viewing both tapes, we find no evidence that Hall's statements were taken out of context or substantially altered in the edited version. The only portions of Hall's interview excluded from the edited tape concerned information about his family, his future plans with Neville, and statements about an extraneous bad act. Much of this information would have been inadmissible at the guilt-innocence stage of the trial. Furthermore, Hall never attempted to admit the remainder of the tape into evidence under Rule 106.[13] The judge did

---

12. See, e.g., Moreno v. State, 22 S.W.3d 482, 489 (Tex.Crim.App.1999).

13. See TEX.R. EVID. 106.

not abuse his discretion in admitting the tapes.[14] Point of error five is overruled.

## CONSTITUTIONALITY OF DEATH PENALTY AND ARTICLE 37.071

 In his seventh through thirteenth points of error, Hall complains that Article 37.071 is unconstitutional or operates unconstitutionally as to him for a variety of reasons. Specifically, Hall asserts in his seventh point of error that Article 37.071 gives the jury too much discretion and insufficient guidance "to avoid the improperly capricious imposition of the death penalty." This Court has consistently decided this issue adversely to Hall's position.[15] Point of error seven is overruled.

 In points ten through thirteen, Hall argues that the mitigation question included in the death penalty statute unconstitutionally limited the jury's consideration of the mitigating evidence and otherwise failed to adequately guide the jury in considering the evidence.[16] This question is a statutory codification of the dictates handed down by the United States Supreme Court in *Penry v. Lynaugh*.[17] We have previously held this provision to be constitutional, and Hall has presented no new arguments here.[18] Points of error ten through thirteen are overruled.

 In his eighth and ninth points of error, Hall asserts that it is a violation of due process and cruel and unusual punishment to inflict the death penalty on the mentally retarded. In arguing these two points, Hall does not distinguish, nor does he provide authority distinguishing, between his due process rights and the prohibition against cruel and unusual punishment included in the Eighth Amendment. We will likewise answer the two issues together without distinction.[19]

We note that the United Supreme Court has granted certiorari twice this year on the issue of whether the Eighth Amendment prohibits the imposition of the death penalty of the mentally retarded. On September 25, 2001, the Supreme Court dismissed as improvidently granted the writ of certiorari granted in *McCarver v. North Carolina*.[20] The case of *Atkins v. Virginia*[21] is still pending.

Hall argues that his cognitive abilities necessarily reduce his culpability to such a level that the assessment of death is a disproportionate punishment. In support of his point, Hall points out testimony from his own expert, clinical and forensic psychologist Dr. Mark Cunningham, who testified that Hall was mildly retarded and generally functioned at the level of an eight- to ten-year-old child. Hall then notes that Texas law does not allow the execution of children who are eight to ten chronological years old, and in fact, does not even prosecute children of that age.

---

14. Tex.R. Evid. 1003; *see also Ladd v. State*, 3 S.W.3d 547, 571 (Tex.Crim.App.1999), *cert. denied*, 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000).

15. *See, e.g., Raby v. State*, 970 S.W.2d 1, 7 (Tex.Crim.App.1998), *cert. denied*, 525 U.S. 1003, 119 S.Ct. 515, 142 L.Ed.2d 427 (1998); *Pondexter v. State*, 942 S.W.2d 577, 586–87 (Tex.Crim.App.1996), *cert. denied*, 522 U.S. 825, 118 S.Ct. 85, 139 L.Ed.2d 42 (1997).

16. *See* Art. 37.071, § 2(e).

17. 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

18. *See Shannon v. State*, 942 S.W.2d 591, 598 (Tex.Crim.App.1996).

19. *See* Tex.R.App. P. 38.1(h).

20. 533 U.S. 975, 122 S.Ct. 22, 150 L.Ed.2d 804 (2001).

21. 533 U.S. 976, 122 S.Ct. 24, 150 L.Ed.2d 805 (2001).

Thus, he argues, the law should not allow the execution of a person with the "mental age" of a child.

The United States Supreme Court answered this question in *Penry* when it addressed whether it is cruel and unusual punishment under the Eighth Amendment to execute a mentally retarded person "with Penry's reasoning ability."[22] The Supreme Court reasserted the principle that punishment should be directly related to the personal culpability of the criminal defendant, and defendants who commit criminal acts "that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."[23] Indeed, the Court agreed that mental retardation has long been regarded as a factor that may diminish an individual's culpability for a criminal act.[24] However, the Court could not conclude that all mentally retarded people, by virtue of their mental retardation alone and apart from any individualized consideration of their personal responsibility, inevitably lack the cognitive, volitional, and moral capacity to act with the degree of culpability associated with the death penalty.[25] In other words, mentally retarded persons are individuals whose abilities and experiences can vary significantly. And, although retarded persons often have difficulty learning from experience, some are fully capable of learning, working, and living in their communities.[26] In light of these diverse capacities and life experiences, the Court concluded that it could not be said that all mentally retarded people, by definition, can never act with the level of culpability associated with the death penalty.[27]

The principle set forth in *Penry* applies with equal force today. Although Hall presented evidence that he generally functions at the level of an eight- to ten-year-old child, the jurors were required to consider this evidence only in light of all of the evidence presented. So long as the sentencers could consider and give effect to mitigating evidence of mental retardation in imposing sentence, and make an individualized determination whether "death is the appropriate punishment" in this particular case, the Eighth Amendment does not preclude the assessment of a death sentence.[28]

The jurors not only had Dr. Cunningham's assessment that Hall functioned as a child, but they also had his concession that Hall would be considered only "mildly retarded." Furthermore, the jury had the testimony of the State's expert, Dr. Randall Price, who was not convinced that Hall was retarded. Instead, Price testified that Hall could be mildly retarded, but he also might be of borderline intelligence. Price further noted that, in his professional opinion, Hall functioned more in the adolescent to young adult stage. Additionally, persons who had worked with Hall at Kroger testified that he did not appear mentally challenged—just lazy. Finally, the jury was able to observe Hall's behavior first-hand in the videotaped interview he gave the press.[29]

22. *Penry,* 492 U.S. at 313.

23. *Penry,* 492 U.S. at 319.

24. *Id.* at 337.

25. *Penry,* 492 U.S. at 338.

26. *Id.*

27. *Id.* at 338–39.

28. *See Penry,* 492 U.S. at 340.

29. *See also Ex parte Tennard,* 960 S.W.2d 57, 60–63 (Tex.Crim.App.1997), *cert. denied,* 524 U.S. 956, 118 S.Ct. 2376, 141 L.Ed.2d 743 (1998).

In light of this evidence, we cannot say that Hall's due process rights have been violated or that he has been subjected to cruel and unusual punishment. Points of error eight and nine are overruled.

We affirm the judgment of the trial court.

PRICE, JOHNSON and HOLCOMB, JJ. concurred in the result.