**Michael Wayne HALL, Appellant,**

v.

**The STATE of Texas.**

No. 73787.

Court of Criminal Appeals of Texas,
En banc.

May 5, 2004.

Opinion Dissenting from Denial of
Rehearing Sept. 15, 2004.

Danny D. Burns, Fort Worth, for Appellant.

Helena F. Faulkner, Assistant District Attorney, Fort Worth, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

KELLER, P.J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, KEASLER, HERVEY and COCHRAN, JJ., joined.

In accordance with instructions from the United States Supreme Court, we reconsider this case in light of *Atkins v. Virginia*.[1] We shall affirm.

## I. BACKGROUND

### A. Procedural history

In January of 2000, appellant's trial for capital murder began. At trial, evidence was introduced by both parties regarding whether appellant was mentally retarded. This evidence was introduced primarily in the punishment phase in connection with a determination of the mitigation special issue. At no point did appellant request that the trial judge or the jury make a specific fact-finding as to whether appellant was in fact mentally retarded.[2]

Appellant was subsequently convicted of capital murder and sentenced to death. In his eighth and ninth points of error on direct appeal, he alleged that inflicting the death penalty on the mentally retarded violates due process and constitutes cruel and unusual punishment under the United States Constitution. On January 16, 2002, this Court affirmed his conviction and sentence.[3] In a published opinion, we held that there was no *per se* bar to executing mentally retarded persons.[4] We also pointed out that the State presented some evidence that appellant was *not* mentally retarded and that the jury had the opportunity to observe appellant's behavior firsthand in a videotaped interview.[5]

After our decision was handed down, appellant petitioned the United States Supreme Court for a writ of *certiorari*. He also filed a state application for writ of habeas corpus, pursuant to Article 11.071.[6] In both of these proceedings, he pursued his mental retardation claim. On June 20, 2002, the Supreme Court decided *Atkins*.[7] On August 5, 2002, in the habeas action, the trial court designated the issue of whether appellant was mentally retarded

---

1. 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

2. Appellant did not contend in his original appellate brief or his brief on remand that he ever made such a request, no such request is contained in the record references supplied in the brief, the State does not contend that such a request was made, and we have not seen such a request in what appear to be the pertinent portions of the record. Appellant shoulders the responsibility of citing all the applicable facts and the record references

supporting those facts. TEX. R. APP. P. 38.1(f).

3. *Hall v. State*, 67 S.W.3d 870 (Tex.Crim.App. 2002).

4. *Id.* at 877–878.

5. *Id.* at 578.

6. All references to articles are to the Texas Code of Criminal Procedure.

7. *See Atkins.*

as a previously unresolved fact issue and ordered a hearing by way of affidavits. On October 7, 2002, the Supreme Court vacated our judgment on direct appeal and remanded the case to us for reconsideration in light of *Atkins.*[8] On December 3, 2002, after reviewing the trial record and the affidavits submitted by the parties, and relying upon personal recollection of the events occurring at trial,[9] the habeas trial court adopted the State's proposed findings of facts and conclusions of law, concluding that appellant is not, in fact, mentally retarded. On February 26, 2003, we denied relief on the habeas application in an order adopting the trial court's findings.[10]

## B. Factual History

Appellant and his friend, Robert Neville, decided to kill someone. In pursuance of their plan, they purchased various weapons, including rifles, pellet guns, and a crossbow, along with ammunition. They decided to kill Amy Robinson, a former co-worker of appellant's at Kroger, because she was an easy target. Robinson suffered from a genetic disorder called Turner's syndrome. As a result, she stood only four feet five inches tall at the age of nineteen and had the mental capacity of a third or fourth grader. She was physically slow and trusted everyone. For this reason, appellant and Neville believed she would not put up a fight.

Appellant and Neville went to the Kroger store where Robinson worked, checked her schedule, and then waited for her to ride her bicycle down the street on her way to work. They persuaded her to go with them for a drive and promised they would take her back to work. They drove Robinson twelve miles away from the store to a remote field, where Neville shot at her with the crossbow but failed to hit her. Appellant then shot her in the leg with a pellet gun, and Neville shot her in the chest with a .22 caliber rifle. Appellant also shot her in the chest with the pellet gun several times. Neville then shot Robinson in the head, killing her instantly, because appellant worried someone would hear the loud noises that Robinson was making. Appellant and Neville returned to the scene of the crime a few days later. Appellant took keys and money from the victim's pocket, and Neville fired some more shots into her dead body. A few weeks later, the police arrested the two men as they tried to flee to Mexico.

## C. Mental retardation evidence

### 1. Trial

During the guilt phase of trial, one State's witness, Tamara Campbell, testified briefly about appellant's mental ability. Campbell had been appellant's supervisor at Kroger. When asked whether appellant appeared to be mentally challenged, Campbell replied, "No. He was lazy, but he wasn't mentally challenged, in my opinion." However, according to Campbell, Amy Robinson was mentally challenged.

During the punishment phase, the parties introduced a substantial amount of evidence regarding appellant's level of intelligence. Karen Hall, appellant's mother, testified that appellant had always been slower than other children. At age five, he could not stack blocks. He was in special education classes from the first

---

8. *Hall v. Texas,* 537 U.S. 802, 123 S.Ct. 70, 154 L.Ed.2d 4 (2002).

9. Judge Sharen Wilson presided at both the trial and the habeas proceedings.

10. *Ex Parte Hall,* No. 53,668–01, slip op. at 1–2 (Tex.Crim.App., February 26, 2003)(not designated for publication).

through the eighth grade, was placed in regular classes in ninth grade but could not handle them, and did not advance beyond the tenth grade. Karen further testified that appellant plays like an eight-year-old and associates with children who are eight, nine, and ten years old. She catalogued a number of areas in which appellant was deficient, when compared to others his age: he could not count change, tell time from a traditional clock with hands, read a menu, use public transportation, use a vacuum cleaner without tearing it up, make his bed, and wash dishes. He also would not use a table knife; where a piece of meat, such as a pork chop, needed to be cut, appellant would tear it up with his hands. He also became easily lost within a few blocks from home, and he often chewed with his mouth open. She conceded that appellant could read and write at a fourth grade level, use the phone, operate a microwave, load and unload a dishwasher, use a pencil and pen, make a sandwich, brush his teeth, shave, and dress himself. She also testified that he read children's books and the Bible, and she admitted that appellant was able to read well enough to pass a written driver's license examination (after failing the computerized version). She also admitted that appellant has had at least one girlfriend his own age, and possibly two.

Damon Lee Hall, appellant's older brother, testified that, at age fourteen to fifteen, appellant associated with children ages eight to nine. Appellant had trouble explaining things-taking a long time to do so. He could understand directions only when they were given slowly. Appellant had difficulty understanding how to play pool and had trouble reading clocks with hands. Appellant also had trouble counting money and did not know when he was shortchanged. Damon testified that he once took advantage of appellant's deficiency to cheat him out of some of the proceeds of the sale of a video game console system.

Ken Traynor was a wood shop teacher when appellant went to school. At first, Traynor believed appellant was mentally disturbed, but he came to believe that appellant was simply lacking intelligence. Appellant could not do the simplest of tasks. He could not understand concepts even after repetition, and he would not remember how to do something from one day to the next. Mathematics was largely beyond appellant's ability. Even the simplest addition was sometimes a challenge, while multiplication and division were simply out of the question. Traynor recalled one assignment that took appellant eight weeks to complete, when it should have taken only two. However, Traynor also recalled that appellant had difficulty getting motivated to work-sometimes he would just stay in one place and sit. Appellant did successfully complete a video game console-something he was actually highly motivated to do. He sometimes stayed late to work on it. When asked about appellant's verbal abilities, Traynor replied that appellant did not have any trouble verbalizing his responses.

Cheryl Conner was a school psychologist at the time she testified, but she had taught appellant English, reading, and math during his freshman and sophomore years in high school. She estimated that appellant had the reading comprehension of a first-grader and the math ability of a third-grader. Appellant could add and subtract on paper but not in his head. He could not write complete sentences or paragraphs without significant prompting. He could follow only one instruction at a time-and sometimes he would fail at that. Conner had to set a five-minute task timer to keep appellant on task or he would fall asleep or let his attention drift to the point where he would simply sit and stare.

Some teachers commented that appellant drooled in class. He would often sleep in class and not do assignments. Some of the other teachers thought appellant was lazy, but Conner believed that appellant was very depressed. She believed appellant's inability to understand things caused him to give up and tune out. She did testify that appellant was apparently good at video games.

According to a Test of Non-verbal Intelligence (TONI), appellant had an IQ score of 84, while a Wechsler Intelligence Scale for Children—Revised exam (WISC–R) indicated an IQ of 71. Appellant's school classified him as "learning disabled," not as "mentally retarded." Appellant was classified as learning disabled because, in the opinion of the assessors, he failed to live up to his potential. Linda Akin assessed appellant's "adaptive behavior" using "informal measures." Akin concluded: "Results showed that the student's level of intellectual functioning is consistent with his or her adaptive behavior, with no significant deficits in either area." Conner disagreed with that assessment. Conner admitted, however, that depression can lower an IQ score.

Chris Bybee was appellant's math teacher during the 1995–96 school year. He characterized appellant as slow and difficult to motivate. Appellant could not perform multiplication or division. Based upon appellant's work, Bybee guessed that appellant's IQ was in the upper 60s. Bybee admitted that appellant was unmotivated most of the time, was sometimes lazy, and sometimes slept in class.

Dr. Mark Cunningham was a clinical and forensic psychologist hired by the defense.

Dr. Cunningham administered the Wechsler Adult Intelligence Scale, third edition, exam (WAIS–III)to appellant and obtained a full-scale IQ score of 67 with a three percent margin of error. Dr. Cunningham noted that a 1991 WISC–R exam had placed appellant's IQ at 71 with a five percent margin of error. At the time of the 1991 evaluation, appellant was classified as learning disabled, but at an earlier evaluation, conducted in 1988, appellant had been classified as mentally retarded.

Based upon interviews with Bybee, Conner, and Tina Dodson (appellant's stepmother), Dr. Cunningham concluded that appellant possessed adaptive behavior deficits in seven different areas: (1) independent functioning (eating, dressing, transportation), (2) economic activity (handling money), (3) language development, (4) self-direction (excessive passivity), (5) socialization (ability to interact with others), (6) social engagement, and (7) functional academics. In support of this conclusion, Dr. Cunningham cited the following observed behavior: appellant could not play cards, give directions to his home, identify nearby streets, or travel to his workplace on his own. Appellant would not brush his teeth or use a table knife.[11] Appellant had no peer-age friends or girlfriends beyond relatively brief relationships. He could not name artists in the music groups to which he listened and was amazed that others could do so. Appellant was easily cheated in trades and in selling things. He was generally gullible and easy to manipulate. Appellant required very specific, concrete instructions and was slow to comprehend or explain things. Appellant took little

11. Dr. Cunningham recited that appellant "tore his pork chop or his meat apart with his fingers unless his mom cut it for him." Although Dr. Cunningham did not cite Karen Hall as one of his sources for determining adaptive deficits, he apparently relied upon her to some degree—perhaps from her trial testimony. Dr. Cunningham was exempted from the rule and Karen had testified before him.

interest in the world around him and displayed low initiative.

Dr. Cunningham also administered the Wide Range Achievement Test, third edition, exam (WRAT III), designed to show a person's ability in the area of functional academics. Appellant's reading score placed him at an IQ of 59, his spelling score at an IQ of 51, and his arithmetic score at an IQ of 55. Dr. Cunningham concluded that appellant was indeed failing to live up to his potential, but his potential was mental retardation and appellant was scoring even worse than that. Dr. Cunningham commented on the TONI–II exam, which had yielded an IQ of 84, by saying that the potential for inaccuracy in that test was high. The TONI test was designed primarily for students who were difficult to test, sometimes because they did not speak English, or were paralyzed, or had some other disability not necessarily related to intelligence that impeded the effectiveness of the more comprehensive, individually-administered intelligence exams. Dr. Cunningham observed that the TONI–II exam was only fifteen minutes long, while an individually-administered intelligence exam took one and a half hours. In addition, the TONI–II was administered in a group setting, which made cheating (looking on someone else's paper) possible. Dr. Cunningham concluded that appellant would be classified as "mildly mentally retarded" under the DSM–IV [12] classification scheme. Dr. Cunningham also noted that appellant was exempted from taking the TAAS [13] test.

During cross-examination, Dr. Cunningham conceded that appellant had told some lies during their initial interview. Appellant had stated that he never fired a gun, that he never returned to the victim's body, and that he was under the influence of methamphetamine and marijuana. Appellant later admitted that he had stolen money from the victim's dead body. Appellant also remarked that his rights had not been read to him when he was arrested and that the police had no right to question him. Dr. Cunningham also testified that appellant said he was reading a Stephen King novel, a Dean Koontz novel, and the Bible.

The State called several rebuttal witnesses. The first was Dr. J. Randall Price, a clinical and forensic psychologist and a neuropsychologist. Dr. Price accepted the results obtained by Dr. Cunningham's IQ testing [14] but differed somewhat as to their significance. In Dr. Price's estimation, appellant might be borderline rather than mentally retarded:

Q. Were you able to determine whether or not Michael Hall was mentally retarded?
A. Well, I'm not as convinced that he is as Dr. Cunningham is. He is at that level where it's either borderline, right at the level of mild mental retardation, or he's mildly mentally retarded. It's—it's sort of a judgment call.

Dr. Price did engage in his own adaptive behavior testing, using the Street Survival Skills Questionnaire. The results of that testing showed appellant's adaptive skills to be "pretty average." Appellant was

---

**12.** *Diagnostic and Statistical Manual of the American Psychiatric Association, fourth edition.*

**13.** *Texas Assessment of Academic Skills.*

**14.** Due to a phenomenon known as the "practice effect," Dr. Price could not conduct his own testing. The "practice effect" occurs where a subject's knowledge of a previous IQ test affects the results of a test administered shortly thereafter. According to Dr. Price, a six-month interval between testing is deemed necessary to avoid this phenomenon and to yield a valid set of findings.

borderline in three areas: time, using money, and measurements. He was average on tools, domestics, health and safety, personal services, and the use of functional signs.[15]

Dr. Price further testified that, during his interview with appellant, appellant acted and talked like an adolescent or young adult. Appellant spoke in a fluent, articulate manner about his crime and related events in a coherent, logical way. His thought processes were on topic, logical, and goal-oriented. Appellant's thought processes appeared to flow "pretty normally" and the interview was like a normal conversation.

During cross-examination, Dr. Price testified that, taking into account the margin of error, Dr. Cunningham's IQ exams of appellant yielded an IQ range of 64 to 71 within a 90 percent confidence level. IQ testing at age twelve yielded an IQ range of 68 to 74 within a 90 percent confidence level. In response to defense questioning, Dr. Price also remarked that appellant used the word "concordance" on his own. In comparing IQ tests, Dr. Price estimated appellant's IQ to be right around 70. Dr. Price conceded that appellant could not think as fast or as well as 97 to 98 percent of the human population. On redirect, Dr. Price testified that, during interviews with himself and Dr. Cunningham, appellant had given a variety of statements minimizing his role in the offense and a variety of excuses for participating in the offense (alcohol, drugs, being "out of it," etc.).

Alan Boles, an eighteen-year-old college freshman, also testified. At age 16, Boles had worked at Kroger along with appellant. Boles testified that appellant taught him how to sack groceries. Boles never noticed anything "slow" about appellant.

Although he was never formally qualified as an expert, Boles had some experience dealing with the mentally retarded: at the time of his testimony, he was part of a program for teaching sports to mentally challenged children.

The State also called Monica Zepeda to the stand. Zepeda testified that she worked as a waitress at a restaurant visited by appellant and Neville. Appellant ordered his own meal (fried catfish) and appeared to utilize eating utensils in a normal manner. Finally, Detective Richard Nutt testified that he had read appellant warnings mandated by Article 38.22, and appellant appeared to understand those warnings.

Several witnesses discussed appellant's head injuries. Karen Hall testified to several head injuries sustained by appellant during his childhood. She admitted that, in several of those incidents, appellant was not taken to a hospital. She alleged that three incidents caused him to be taken to a hospital. In one, a trailer fell on appellant's head and the doctors diagnosed appellant as probably having a slight concussion. In a second incident, he cut his eye open and had to have stitches. In the third incident, he suffered a whiplash injury in an auto accident. Karen admitted that a concussion was the most serious injury appellant had sustained.

While Dr. Cunningham reported obtaining information about head injuries from appellant's family members, he acknowledged that only one incident—involving a laceration of appellant's nose—could be independently verified in medical records. Dr. Cunningham also admitted that there were no medical records to verify that appellant ever suffered a concussion. Dr.

---

**15.** Dr. Price examined in detail what appears to be a subcategory of one of these, denominated "the use of appliances, kitchen tools, and utensils," in which appellant was found to be average.

Cunningham further testified that head injuries played a relatively minor role in his evaluation.

Dr. Price did not find the materials regarding head injuries to be particularly significant. In his view, the incidents did not represent serious enough injuries to cause any brain injury.

We note several other types of evidence that might be relevant to the question of whether appellant is or is not mentally retarded. Karen Hall and Dr. Cunningham testified that appellant was given Ritalin for attention deficit disorder. Karen also testified that appellant was physically abused by one of her boyfriends. Dr. Cunningham also testified that appellant was in a family atmosphere that included maternal alcoholism, observed domestic violence, physical abuse, traumatic sexual experience, and parental neglect.

Appellant's own words and actions are also relevant to this inquiry. At trial, appellant wrote a *pro se* motion to remove his attorneys. The motion was discussed in an *ex parte* hearing, outside the presence of the prosecuting attorneys. Although the motion contained only facts and no law, Judge Cooke, the judge hearing the motion, commented that it was "well drafted" and that he could "name some attorneys that can't draw an instrument any better than this right now." Judge Cooke further commented that this motion, if discovered and used by the State, could damage appellant's attorneys' "diminished capacity" strategy by showing that appellant was actually "pretty bright," to be capable of drafting such a complicated document. After some discussion, appellant decided to withdraw his motion, and the judge ordered that the transcript of the hearing be sealed.[16]

Appellant also participated in an interview with Fox 4 News. This interview was videotaped, and the videotape was later played to the jury. On the videotape, appellant's speech was smooth and fluid, and his thought processes appeared to be coherent and logical. He stated that the victim was chosen because "she trusted us; it was easy." He bragged about his role in the murder: Neville could not have accomplished it on his own because it was appellant who got the victim to trust him. Without appellant, the victim would have escaped. Appellant acknowledged that he and Neville would be punished for killing the victim, and he expressed the hope that he would receive the death penalty. He wanted the death penalty because he had a "sucky-ass life." He indicated that he had tried to take his own life before but had failed: "You can't take your own life but you can take someone else's." He stated that the current method of execution, which allowed one to die sleeping, was better than the gas chamber or the electric chair. He thought killing the victim would be a good way to get the death penalty because that is what would happen to someone who killed a person with a family that cares about her. When asked whether he was forced to talk to the media, appellant responded that he was told, and understood, that he did not have to.

### 2. *Habeas corpus*

Appellant submitted the affidavits of two additional psychologists who opined that appellant was mentally retarded. Sally Church, a licensed professional counselor, licensed marriage and family therapist, and nationally certified school psychologist, licensed in Oklahoma, evaluated appellant's condition based upon his family history; school, medical, employment, jail,

16. A copy of the hearing transcript was available during the habeas proceedings although a sealed version was also included in the direct appeal record.

and prison records; previous evaluations; investigator's reports; court testimony and affidavits; and a psychodiagnostic evaluation of appellant conducted by her at the prison. Church testified that appellant's mother drank alcohol while she was pregnant, had difficulty with depression, was served in special education during public school, and was an overwhelmed, frustrated, abusive, and neglectful parent. Church further testified that appellant was identified in kindergarten as being behind his age norm developmentally, that he was served in special education throughout his public school attendance, that he dropped out in eleventh grade, that the school recommended that he be identified as Mentally Handicapped but his mother declined—wanting him identified as Learning Disabled—and that he was never able to learn reading, math, spelling, and writing beyond the third grade level. She noted that he had vision problems that could be largely corrected with glasses and that he was assessed as having a hearing problem in elementary school, but there was no follow-up on the extent of his hearing loss. She stated that, by the age of ten, appellant had "experienced eleven head injuries, several of which resulted in concussions." She also noted that appellant had been prescribed Ritalin for inattention, impulsivity, and hyperactivity. In her opinion appellant is mentally retarded, being less intelligent than 98 percent of the human population, with an IQ score of 67. She stated that appellant has critical deficits in adaptive skills and behaviors and that it is "highly doubtful that he alone could meet the needs of his day to day life."

She also stated that appellant's physical appearance was unusual. She characterized his appearance as typical of Fetal Alcohol Syndrome or Fetal Alcohol Effect. She stated that he also exhibited characteristics that resemble other genetic disorders such as XXY, Kleinfelter Syndrome; YYX, Extra Y Chromosome; or Fragile X Syndrome. She noted that all of these disorders are related to mental retardation and are present at birth.

Dr. George Denkowski, a psychologist licensed by the State of Texas and certified by the Texas Department of Mental Health and Mental Retardation to conduct evaluations for the purpose of diagnosing mental retardation, also expressed the opinion that appellant is mentally retarded. He noted that a WISC–R test administered to appellant in 1991 (at age twelve) resulted in a full-scale IQ score of 71, a TONI–2 test administered at age 16 resulted in a score of 84, and a TONI–3 test administered at age 20 resulted in a score of 77. However, he considered the TONI tests to be "unreliable indices of general intellectual functioning." Dr. Denkowski also relied upon Dr. Cunningham's adaptive deficits evaluation based upon interviews with Conner and Bybee. And he relied upon the WRAT–III administered by Dr. Cunningham and the K–FAST [17] test administered by Dr. Price to show that appellant's academic skills were seriously deficient. The K–FAST test results indicated that appellant's arithmetic skills and reading skills were less proficient than those of 99 percent and 95 percent of same-aged persons, respectively. Finally, Dr. Denkowski criticized the Street Skills Survival Questionnaire as being an inaccurate tool for diagnosing mental retardation in an adult. Dr. Denkowski did not personally interview appellant.

Appellant also submitted affidavits from his trial attorneys, a fellow death-row inmate, two defense private investigators, and a former teacher. All of these people opined that appellant was mentally re-

17. *Kaufman Functional Academic Skills Test.*

tarded. William Harris, one of the trial attorneys, stated that he had numerous opportunities to observe appellant's mental limitations. Harris found that, even after multiple explanations, appellant could not grasp the law of parties and why the law of parties made him liable for capital murder. Appellant also had little or no sense of what things cost or what may or may not be available to a jail inmate. Harris also commented that appellant "was fairly adept at masking his mental retardation if you only deal with him superficially."

Paul Conner, appellant's other trial attorney, stated that appellant would ask the same questions day after day—showing an inability to remember or grasp the answers. Appellant would mask his retardation by not asking questions. He would sometimes sound more informed on a subject than expected, but this was because he would parrot words and phrases that he heard, without grasping their meanings.

Bill Coble, a fellow death row inmate, occupied a cell immediately adjacent to appellant's. Coble remarked that appellant was called "Half Deck" by the prison guards and other inmates on death row. He characterized appellant as slow in his thinking and "worse off than Johnny Penry" whom he also knew about. Appellant could not learn the meanings of new words, even when told their meanings over and over again. Due to his lack of understanding of money, he could not handle buying items from the prison commissary. Appellant had to be reminded every day to wash himself, shave, and clean the toilet. He also had to be reminded how to keep his food container and his bedding clean. Appellant would often "space out" and forget what he had just done. He listened to cartoons on the radio (on a television sound setting) and could parrot what he heard, if it was something he has heard over and over again. Coble stated that appellant was very upset to learn about a civil suit against himself and Kroger regarding Robinson's death. Appellant thought he could get another death penalty from the civil suit.

Joseph Ward, a private investigator appointed to assist the defense in habeas corpus proceedings, stated that appellant's ability to understand the subject of conversation appeared to be significantly less than that of others his age. Appellant's demeanor was childlike, and he acted inappropriately for someone his age. He could not recall or meaningfully relate events surrounding his arrest. He had difficulty remembering the other private investigator's name even though he had just been told the name. Appellant did not know the meanings of many words, would use words inappropriately, and would mispronounce them. The other private investigator, John Ladd, stated that appellant had an attention span of five minutes and talking to him was like talking to a six- or seven-year-old child.

Stephen Dollar, a licensed attorney at the time of the habeas action, was appellant's world history teacher during the 1995–96 school year. Dollar testified that appellant could not follow instructions or complete assignments as distributed. Appellant displayed no cognitive ability in the classroom and demonstrated behaviors similar to those of a child with a diagnosis of mental retardation. He would not respond to his own name when called upon and would stare out the window and drool most of the class hour. Appellant could not accomplish the most menial of tasks, even when they were simplified to accommodate his special education needs. He appeared to have no friends, and he was an object of ridicule by his fellow students.

The State presented controverting affidavits. Five prison guards—Brandon

Daniel, Julie Perego, Suzanne Prosperie, Todd Tatum, and Darrell White—averred that appellant is not mentally retarded. Daniel, who was assigned to appellant's area about one day a week, said that appellant "acts as normal as anyone in his pod." He further stated that he "had been around people who were slow mentally" but had "not seen that in" appellant. Further, there was no indication that appellant did not understand how to obey orders and follow prison rules. Under Daniel's observations, appellant was "just a normal inmate."

Since Perego arrived at the prison unit in June of 2001, she saw "nothing unusual" in appellant's conduct that was "different from [that of] the other inmates." She characterized his behavior as "normal" and said that she never had to tell him what to do more than once. She further stated, "I have never seen anything that would make me think Michael Hall is mentally retarded and he seems pretty normal to me in my observations of him."

Prosperie saw appellant, on average, two days a week. Hall seemed like "just a normal inmate." He socialized with other inmates, and there was nothing unusual about his conduct or attitude. She remarked that his cell was filthy, but it was so by his choice. She stated that she had not seen any signs of mental retardation or illness since she had been around him, and she had some experience with mental retardation because her neighbor's daughter was mentally retarded. She had never heard appellant referred to as "Half Deck" by anyone.

In his three months around appellant, Tatum "observed nothing unusual" about him. Although appellant's hygiene was not the best, he had "learned the system here" and understood what he was doing. Tatum knew some children in school with Down's syndrome, but he had not seen anything in appellant to indicate that he is mentally retarded.

White had also worked around appellant for three months. He stated that he had not observed anything unusual about appellant's conduct and that appellant appeared to be "just a normal inmate." He had no problems with appellant failing to understand anything he told appellant to do. Appellant took showers, brushed his teeth, and did other normal activities. White had an uncle who was mentally retarded and had to be told repeatedly what to do, and appellant was nothing like his uncle. White further stated, "I have seen nothing in my observations of Michael Hall that makes me think he is mentally retarded."

The State also presented affidavits of Dr. Price. Referring to his opinion given at trial, Dr. Price stated that appellant's "intelligence fell either in the borderline range of intellectual functioning (IQ = 70–84) or in the upper end of mild mental retardation (IQ = 50–55 to 70)." Based upon his review of various tests and records, Dr. Price opined that appellant was a poor student but does not have significant adaptive deficits. He concluded: "My review of this case does not clearly indicate that Michael Hall is mentally retarded." In response to Dr. Church's affidavit, Dr. Price stated that appellant did *not* exhibit signs or symptoms associated with genetic disorders such as Fetal Alcohol Syndrome, Kleinfelter's Syndrome, Extra Y Chromosome, or Fragile X Syndrome.

## II. ANALYSIS

### A. General considerations

In *Atkins,* the Supreme Court held that the Eighth Amendment's "cruel and unusual punishments" clause prohibits the

execution of mentally retarded persons.[18] The Supreme Court left to the States the task of fashioning appropriate procedures for determining who is in fact mentally retarded:

> To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. In this case, for instance, the Commonwealth of Virginia disputes that Atkins suffers from mental retardation. Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus. As was our approach in *Ford v. Wainwright* [477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335], with regard to insanity, "we leave to the State the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." [19]

 In the habeas context, we recently adopted temporary guidelines, to be used during the legislative interregnum, for determining whether a defendant is mentally retarded.[20] Under these guidelines, a person is considered mentally retarded if he has these three characteristics: (1) "significantly subaverage general intellectual functioning" (an IQ of about 70 or below), (2) "related limitations in adaptive functioning," and (3) onset of the above two characteristics before age eighteen.[21] Expert testimony is relevant to a fact-finder's determination of these factors but is not necessarily conclusive.[22] A separate jury determination of mental retardation is not required,[23] and at least on habeas corpus, the defendant shoulders the burden of showing his mental retardation by a preponderance of the evidence.[24] And we afford almost total deference to the trial judge's findings of fact, especially when those findings of fact are based upon credibility and demeanor.[25]

Unlike *Briseno*, the present case is still pending on direct appeal. Issues are often evaluated differently in the habeas corpus and direct appeal contexts. Some claims fail on direct appeal because the record is not sufficiently developed to evaluate the claims. This occurs most often with ineffective assistance of counsel claims.[26] Other claims may be evaluated under a different (more onerous) standard in the habeas context than in the direct appeal context.[27] Neither of these differences are material to the case at hand.

---

18. 536 U.S. at 321, 122 S.Ct. 2242.

19. *Atkins*, 536 U.S. at 317, 122 S.Ct. 2242 (citation omitted).

20. *Ex parte Briseno*, 2004 WL 244826.

21. *Id.* at * 3, * 3 n. 24.

22. *Id.* at * 4.

23. *Id.* at * 4–* 5.

24. *Id.* at * 5–* 6.

25. *Id.* at * 6.

26. *Thompson v. State*, 9 S.W.3d 808, 813–814 (Tex.Crim.App.1999)(direct appeal record often inadequate in the ineffective assistance of counsel context, especially when counsel is not asked for his reasons for his conduct).

27. *Ex parte Fierro*, 934 S.W.2d 370, 372 (Tex. Crim.App.1996), *cert. denied*, 521 U.S. 1122, 117 S.Ct. 2517, 138 L.Ed.2d 1019 (1997)(standard of harm more onerous on the defendant); *compare Ex parte Elizondo*, 947 S.W.2d 202, 209 (Tex.Crim.App.1996)(on habeas, newly discovered evidence must unquestionably establish innocence) *and Wallace v. State*, 106 S.W.3d 103, 108 (Tex.Crim.App. 2003)(in motion for new trial context, newly discovered evidence must be "probably true" and "will probably bring about a different result on retrial").

## B. The habeas record and judicial notice

■ Had *Atkins* been handed down before our original opinion on direct appeal, a serious question about the adequacy of the direct appeal record would have been before us. While the parties introduced a significant amount of evidence regarding whether appellant was mentally retarded, mental retardation was not considered as a discrete issue by the trial judge or the jury. Although the parties certainly had incentive to litigate the question of appellant's intelligence, the litigation occurred as a question of degree: defense counsel could contend that appellant's low intelligence mitigated his moral culpability even if it did not amount to mental retardation, while the State could contend that, even if appellant were in the mental retardation range, he appreciated the consequences of his actions to a sufficient degree to deserve the death penalty. Had mental retardation been an ultimate issue, the parties may well have litigated the issue even more robustly than they did, as the issue would be a question of kind (which side of the mental divide appellant was on) rather than degree (how much did appellant appreciate the immorality of his conduct).

We did not address the adequacy of the direct appeal record on original submission because, at that time, we did not perceive mental retardation as a bar to execution. But the trial court and this Court did have the benefit of *Atkins* during the habeas proceedings. The parties had ample opportunity to present evidence at that time on the specific issue of mental retardation.

And we can consider the habeas proceedings and evidence in the current posture of this appeal. Over three decades ago, we addressed one of those rare instances in which we considered a particular issue on direct appeal after evidence had been obtained on that issue in habeas proceedings.[28] In *Huffman v. State*, the defendant filed a motion for new trial, alleging newly discovered evidence.[29] This motion was not accompanied by affidavits supporting the allegation.[30] While his appeal was pending, the defendant was released from custody due to an oversight.[31] This Court dismissed the appeal on the ground that the defendant's absence from custody was the equivalent of an escape.[32] The defendant was subsequently granted an out-of-time appeal by the Fifth Circuit.[33] After the right to appeal was granted but before the appeal was filed, a hearing was held on a state application for writ of habeas corpus challenging the same conviction.[34] Evidence not contained in the appellate record was presented at this hearing, including the alleged newly discovered evidence and evidence that the defendant was not represented by counsel at the time the motion for new trial was filed.[35]

We held that this Court could properly take judicial notice on direct appeal of the habeas proceedings and consider the evidence developed at the habeas hearing.[36] Finding that the defendant was without counsel when the motion for new trial was

---

28. *Huffman v. State*, 479 S.W.2d 62 (Tex. Crim.App.1972).

29. *Id.* at 68.

30. *Id.*

31. *Id.* at 64.

32. *Id.*

33. *Id.* at 63.

34. *Id.* at 64.

35. *Id.* at 64, 68.

36. *Id.* at 68.

filed, we considered the merits of his newly discovered evidence claim in light of the habeas record and overruled his points of error.[37]

The present case is on all fours with *Huffman:* as in that case, we are faced in a direct appeal with an issue that has already been presented to us on habeas corpus. Consequently, we address appellant's mental retardation in light of both the direct appeal and the habeas records. In this vein, we reject any notion that the direct appeal record in this case must be viewed in isolation. The additional, habeas evidence is before us; taking it into account is necessary for a complete and accurate view of appellant's intellectual capabilities.[38]

### C. Burdens of proof and standards of review

That standards for evaluating a claim sometimes differ from appeal to habeas is also of no concern here. While direct appeal standards may apply to a claim on direct appeal even though the claim is supported by evidence obtained in judicially noticed habeas corpus proceedings,[39] if a substantive component of a particular type of claim already contains a standard that equals or exceeds the applicable standard on habeas corpus, then the inquiry collapses to analyzing the claim by

its components.[40] In the present case, we decide that mental retardation is comparable to an affirmative defense, and thus, the burden is always upon the defendant to prove that condition by a preponderance of the evidence. So, the standards for proving mental retardation at trial and on habeas are the same, and the resulting standard of review of a trial court's findings against the defendant are also the same in both contexts.

The groundwork for this conclusion has already been laid in *Briseno.* There we observed that the issue of mental retardation is similar to the issues of insanity, competency to stand trial, and competency to be executed—all of which impose upon the defendant a preponderance of the evidence burden of proof.[41] We now also observe that the mental retardation issue could be described as a confession-and-avoidance type of punishment-mitigating factor, which would make it like several statutory punishment-mitigating factors that carry the same proof standard as affirmative defenses: sudden passion in the murder context,[42] release in a safe place for the offense of aggravated kidnapping,[43] imperfect renunciation for the offense of organized criminal activity,[44] and, at least arguably, imperfect renunciation

37. *Id.* at 68–69.

38. Moreover, appellant can hardly complain about an appellate court's failure to limit its review to the direct appeal record when he did not request a finding on the issue at trial, and thus, did not attempt to ensure that the direct appeal record would contain a comprehensive litigation of the issue. *See Martinez v. State,* 867 S.W.2d 30, 33–34 (Tex.Crim.App. 1993), *cert. denied,* 512 U.S. 1246, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994)(defendant could not rely upon evidence of prior adjudication of insanity to establish insanity when he failed to give notice at trial that he wanted to pursue an insanity defense).

39. *See Huffman,* 479 S.W.2d at 68–69 (applying motion for new trial standard for newly discovered evidence).

40. *Fierro,* 934 S.W.2d at 373.

41. *Briseno,* at * 5–* 6.

42. TEX. PEN. CODE § 19.02(d).

43. TEX. PEN. CODE § 20.04(d).

44. TEX. PEN. CODE § 71.02(d).

for inchoate offenses.[45] The counter-example would be the mitigation special issue in capital cases, for which the Legislature has prescribed no burden of proof.[46] But the mitigation special issue is a very broad issue, capable of taking into account a wide range of circumstances. By contrast, mental retardation is a single, discrete fact that by itself mitigates the penalty for capital murder, just as sudden passion, release in a safe place, and renunciation all are discrete facts that by themselves mitigate the penalty for their respective crimes. Given the legislative backdrop for similar affirmative defenses and analogous punishment mitigating factors, we find, absent further legislative guidance, that mental retardation is the type of issue that must be proven by the defendant by a preponderance of the evidence—regardless of when the claim is presented.

■ From that conclusion, it follows that the standard of review is also the same. Giving "almost total deference to a trial judge's determination of the historical facts supported by the record"[47] in the habeas context is essentially the same as *Jackson v. Virginia's* requirement that the evidence be viewed "in the light most favorable to the prosecution" when the findings are adverse to the defendant.[48] Given the same burden, the standard of deference will also be the same, whether the Court conducts a sufficiency review of a mental retardation claim decided at trial or a legal review of a trial court's recommendation on habeas corpus.

## D. The mental retardation claim

■ We now turn to the merits of appellant's claim. His claim has already been addressed on habeas corpus and found to be without merit. The trial court considered the entire trial record and the additional evidence presented in the habeas proceedings. The trial court made its findings after *Atkins* was decided and after the Supreme Court had remanded the direct appeal in this case. The trial court's consideration of the mental retardation claim and our review in the habeas proceedings satisfied the mandate of *Atkins*, and we believe that taking judicial notice of the habeas proceeding and its outcome satisfies the Supreme Court's remand order in the present case. Because the burden of proof and the standard of review are the same on this issue on direct appeal and in habeas proceedings and because we can properly notice the habeas evidence on direct appeal, our conclusion on direct appeal is necessarily the same as our conclusion in the habeas proceedings.

■ In an abundance of caution, however, we have re-reviewed the evidence, and the result of that review is that our conclusion has not changed. While appellant supported his claim of mental retardation with the testimony of three psycholo-

---

**45.** TEX. PEN. CODE § 15.04(d)(no explicit burden placed in the subsection but contained within section that describes successful renunciation as an "affirmative defense").

**46.** *See* Art. 37.071, § 2(e)(1); *Mosley v. State,* 983 S.W.2d 249, 264 (Tex.Crim.App.1998), *cert. denied,* 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999).

**47.** *Briseno,* at * 6.

**48.** *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)("In-

stead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.... This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.").

gists, his mother, his brother, his trial attorneys, two private investigators, four teachers, and a fellow death row inmate, the State controverted his claim with the testimony of a psychologist, five prison guards, a waitress, appellant's former work supervisor, a former co-worker, and a police detective. The State also controverted the claim through cross-examination, pointing to school records indicating that appellant was not mentally retarded. There is also the videotaped interview, the hearing on the defendant's *pro se* motion to remove his attorneys, and of course, the circumstances of the crime itself. While there was significant evidence in favor of a finding of mental retardation, there was also significant evidence against such a finding. The trial judge, who presided over the trial and the habeas proceedings, was in the best position to evaluate the conflicting evidence. Her findings, which we have judicially noticed in the current direct appeal, deserve great deference. Because the trial court's conclusion that appellant is not mentally retarded is supported by the record, we should and do defer to that conclusion.[49]

The judgment of the trial court is affirmed.

PRICE, J., filed a concurring opinion in which COCHRAN, J., joined.

JOHNSON, J., filed a dissenting opinion in which HOLCOMB, J., joined.

HOLCOMB, J., filed a dissenting opinion.

---

**49.** Although appellant is not entitled to a review limited to the trial record, we note that our holding would not change if we considered only the evidence submitted at trial. A conclusion that appellant is not mentally retarded is supported by the trial record.

PRICE, J., concurring, in which COCHRAN, J., joined.

I agree with the majority that we may consider the habeas record in deciding this direct appeal on remand from the United States Supreme Court. I also agree that the record in this case supports the trial court's conclusion in habeas proceedings that the appellant is not mentally retarded. I write separately to point out that, generally, for the review of a contested *Atkins v. Virginia*[1] claim, the trial court will need to hold a live hearing and not base its decision solely on affidavits submitted by the parties.

The habeas proceedings in this case of which we took judicial notice were conducted by affidavit without a live hearing. In this case, the extensive affidavits provide ample evidence from which the trial court could make its findings that the applicant is not mentally retarded. But this is a unique case.

When an applicant's status as a mentally retarded person is contested, a hearing by affidavit will generally be inadequate. The main reason we defer to a trial judge's findings is that he is in a better position to determine credibility and determination by seeing and hearing a witness testify. We often say that because we have only a cold record, reviewing courts do not have the best vantage point from which to make factual determinations.[2] Live testimony allows the convicting court to observe a witness's demeanor, which can add significant information to credibility determinations. Also, opposing counsel may cross-examine witnesses to test the content of a witness's testimony. These valuable as-

---

**1.** 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

**2.** *See Manzi v. State*, 88 S.W.3d 240, 254 (Tex.Crim.App.2002) (Cochran, J., concurring).

pects of live testimony are not available in a hearing by affidavit.

Code of Criminal Procedure Article 11.071, Section 9(a) states the "[t]o resolve the [previously unresolved] issues [of fact] the [convicting] court may require affidavits, depositions, interrogatories, and evidentiary hearings and may use personal recollection." But, if the convicting court conducts a hearing by affidavit, and the affidavits are inadequate for us to review the convicting court's findings, we will be forced to remand to the convicting court for a live hearing, especially if the parties voice objections to the convicting court's findings. The best course to resolve a contested *Atkins* claim is to hold a hearing at which live testimony is received.

With these comments, I join the majority.

JOHNSON, J., dissenting, joined by HOLCOMB, J.

I respectfully dissent. Retardation, like insanity, is a question of fact, not law. We may speak of satisfying the legal standard for insanity, but we assign the task of determining if a defendant was insane at the time of the offense to the finder of fact, usually the jury. In this case, the trial court made a finding of fact (applicant is not retarded) based solely on affidavits (written factual statements) and from that finding of fact drew a legal conclusion (under *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), it is not unconstitutional to execute him).

This case was tried before the United States Supreme Court decided *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and radically changed the law. We are not free to ignore that change.

Almost all of the evidence that has been brought forward by either side was ad-

duced during the punishment phase of the original trial. At that time, mental retardation was a mitigating factor, not a dispositive issue as to ineligibility for the death penalty; the convicting jury was limited to considering it as part of the special issues, particularly on the issue of future dangerousness. No trier of fact in this case has ever heard live testimony, subject to testing on cross-examination, on the specific issue of whether appellant is mentally retarded. The hearing at issue here was had on affidavits only, thus Appellant's claim that he is mentally retarded, and therefore is not subject to execution, has never been directly and thoroughly litigated.

That a live, contested hearing is necessary is clear from an examination of the conflicting evidence adduced at trial. A short summary of the testimony from the punishment phase of appellant's trial illustrates this.

Of the fourteen defense witnesses whose testimony about appellant's mental abilities was considered at the hearing on the writ of *habeas corpus,* five also testified at trial and had extensive contact with appellant: his mother, Karen Hall; his brother, Damon Hall; and teachers Ken Traynor, Cheryl Conner, and Chris Bryce. A psychologist, Dr. Mark Cunningham, also testified at trial. Four others with extensive contact with appellant testified by affidavits on the writ of *habeas corpus;* a teacher, Stephen Dollar; appellant's trial attorneys, William Harris and Pat Conner; and another death-row inmate, Bill Coble. The other affiants were two private investigators hired by appellant's trial attorneys, Joseph Ward and John Ladd, and two psychologists, Dr. George Denkowski, and Dr. Sally Church. Linda Akin, an employee of the school district, did not testify at trial or submit an affidavit. She was mentioned in Dr. Conner's trial testi-

mony in response to a question from the prosecutor during cross-examination of Dr. Conner regarding the IQ test that was done by Garland schools as part of the comprehensive individual assessment.[1] It is not even certain that Ms. Akin wrote the assessment under discussion, and in any case, that assessment was not admitted into evidence.

Of particular interest here are the affidavits of appellant's attorneys and others who helped prepare appellant's case for trial. Both attorneys attested that appellant would ask a question, listen to the answer, say that he understood, then re-ask the same question within a very short time, sometimes within minutes; he showed little to no understanding of many of the aspects of trial. They soon recognized that appellant "bitterly did not want people to think him 'dumb'" and would parrot words and phrases he had heard in an effort to avoid appearing so. Both investigators attested that appellant behaved in ways inappropriate to his age and did not seem to be able to recall events such as his arrest. Mr. Ladd recounted that appellant thought himself very clever for being able to get extra food for an evening snack when, in reality, he was merely saving some of his supper for later.

Bill Coble has occupied the cell next to appellant as long as appellant has been on death row. Mr. Coble has been on death row for a long time, knows Johnny Paul Penry, and in his opinion, appellant "is worse off than Johnny Penry."

Of the ten state witnesses who claimed personal contact with appellant, none had extensive or lengthy contact with appellant. Dr. Randall Price, a psychologist, had a single interview with appellant. Al Boles said that appellant taught him how to perform the simple task of bagging groceries. His testimony, under questioning by the state, consisted largely of a comparison of the mental limitations of appellant and those of the victim. Monica Zepeda was a waitress who had a single contact with appellant. The state represented to the trial court that she was able to testify that appellant showed no remorse; no such testimony was elicited. Richard Nutt, a detective, testified that he had read the Miranda warnings to appellant, and that he believed that appellant understood them because he had looked Nutt in the eye and said he understood.

The affidavits of the five prison guards each consist of a few conclusory statements, which are not infrequently repetitive. Many of the statements in these affidavits, such as "I have heard Michael Hall's radio on in his cell," are not helpful in assessing appellant's mental abilities. Brandon Daniel worked on death row once a week. Suzanne Prosperie worked on death row twice a week. Todd Tatum and Darrell White worked on death row for three months. The affidavit of Julie Perego consists of 6 general, conclusory state-

---

1. Q: Okay. Now, one other thing I wanted to ask you about. On the assessment that was done during the testing, it says,—and maybe you can interpret this for me,—"The student's adaptive behavior was assessed using informal measures. Results showed that the student's level of intellectual functioning is consistent with his or her adaptive behavior, with no significant deficits in either area."
Do you know what they meant by that?
A: Yes, I do.
Q: Okay, do you agree with it?
A: No.
Q: Okay. Do you know who prepared that report?
A: I believe the last one was prepared by Linda Akin.
Q: Who? I'm sorry.
A: Linda Akin.
Q: Okay. And is she with the school district?
A: Yes, she is.

ments, including "I have been on this unit since June 2001 and I have been around Michael Hall at different times."

Mental retardation can arise in many ways. The National Center on Birth Defects and Developmental Disabilities [2] states that retardation may occur before birth,[3] during birth,[4] or after birth from disease or injury.[5] The United States National Library of Medicine lists more than forty causes, the largest category being unexplained.[6] Many persons who are, in fact, mentally retarded may appear normal to the untrained eye or on casual contact and are not identifiable by their manner of speech or their appearance. A single casual contact, such as waiting on a mildly mentally retarded person in a restaurant, has a high probability of not revealing the retardation.

Lay persons often have unrealistic ideas about what mentally retarded persons look like and how they act. There is a wide range of abilities encompassed by the term "mentally retarded"; the term applies equally to those whose are able to live successful independent lives and to those who live and die in a vegetative state. Mr. Tatum attested that he "knew some kids in school with Down's syndrome" and that appellant is not retarded. It is well known that Down's syndrome creates a distinctive physical appearance. If Down's syndrome is Mr. Tatum's standard for diagnosing mental retardation, then of course, appellant is not retarded in his eyes. Ms. Prosperie claimed to know that appellant is not retarded because her neighbor's daughter is retarded. We do not know the extent of that child's retardation or how it manifests in appearance and behavior. Mr. White said that appellant is not retarded because his uncle is retarded, and appellant is not like his uncle. Mr. Boles, looking back to the time of the offense, says that appellant is not retarded, and the state asserts that Boles is qualified to make that judgment because he now works with mentally challenged children. Each of these lay witnesses appear to have judged appellant's mental capacity by personal standards formed by personal experience with a very small number of retarded persons. Given the wide range of manifestations of mental retardation, these witnesses, although sincere, do not have the experience or training to make any assessment of the mental abilities of appellant.

Even the state's psychologist, Dr. Price, appeared to be uncertain as to appellant's mental abilities. He did not testify that appellant is not mentally retarded but rather that his "review of this case does not clearly indicate that [appellant] is mentally retarded," and he conceded that appellant's intelligence "fell either in the borderline range of intellectual functioning (IQ = 70–84) or in the upper end of mild mental retardation (IQ =50–55 to 70)." Our definition of mental retardation encompasses parts of both ranges. Dr. Price also stated that "[t]here is no doubt that

---

2. http://www.cdc.gov/ncbdd/dd/ddmr.htm.

3. Such causes include: an error in number of chromosomes (Down's syndrome), defects in chromosomes (fragile X, Angelman and Prader–Willi syndromes), missing chromosomes (Cri-du-chat syndrome), mis-located chromosomes, metabolic disorders (phenylketonuria), maternal disease or drug use (rubella, fetal alcohol syndrome, cocaine or amphetamine abuse), maternal malnutrition, and physical abnormalities (hydrocephalus).

4. Such causes include: HIV, asphyxia, and birth trauma.

5. Such causes include: head injury, stroke, meningitis, lead poisoning, malnutrition, very high bilirubin levels, and abuse such as shaking.

6. http://www.nlm.nih.gov/medlineplus/ency/article/001523/htm.

Mr. Hall has low intelligence and poor academic abilities...."

The state argues that appellant's assignment to special education classes was based on "learning disabilities," a claim that is refuted by school records that indicate that the school wished to designate him as mentally retarded, but did not do so at his mother's request. The state conceded in its answer to appellant's application for writ that appellant had passed the written portion of the driving license examination only after his mother worked with him for three days.[7] The state further urged that the trial court should entirely ignore the testimony of Dr. Church because, although having appropriate credentials, she was licensed as a psychologist only in Oklahoma.

I am loathe to find that appellant is not mentally retarded when that finding is based largely on the lay opinions of a store supervisor, a waitress, a bag boy, and five prison guards, and the expert opinion of a psychologist who could not reach a definite conclusion, especially when all had limited contact with appellant. I am unpersuaded that bragging or using big words and claiming to read classic literature establishes that appellant is not retarded. If appellant is, in fact, retarded, his statements may establish only that he, like many retarded persons, wishes to be regarded as "normal" and "smart" and that he will behave in ways that he thinks will cause others to regard him as such, just as persons with normal intelligence will behave in ways that are perceived as producing acceptance. As Dr. Church noted in her affidavit, appellant "had difficulty with the requirements of doing the work of a 'stocker' and was demoted to bagging groceries." She also stated, "His main moti-

vation is not to appear to be a 'dummy' in order to mask his deficits. He tends to say what he has heard others say and/or to say what he thinks others expect him to say. This is not at all unusual as a coping mechanism for the mentally retarded population."

Nor are persons with limited mental abilities immune from other human foibles, such as lying. A well-drafted motion may be the product of a skilled jailhouse writ writer. Persons with limited mental ability often do extremely well in structured environments, and I cannot think of a more structured environment than death row.

It may very well be that a full hearing on appellant's claim of mental retardation, with the opportunity to cross-examine witnesses and argue the significance of their testimony, would establish that appellant is not retarded. However, we will never know unless we order that full hearing and have before us both the tested testimony of persons who are knowledgeable in the mental-health field and relevant lay testimony about his adaptive behavior.

I respectfully dissent.

HOLCOMB, J., dissenting.

I do not dispute that, in general, this Court can properly take judicial notice on direct appeal of a habeas proceeding, consider the evidence developed at a hearing on habeas, and afford almost total deference to a trial judge's determination of the historical facts supported by the record. However, in this case, determining appellant's claim of mental retardation by considering the evidence developed on habeas in addition to that adduced at trial does not provide appellant with a constitutional-

---

7. In his affidavit, Dr. Denkowski attests that appellant passed on the third try but was never able to pass the driving test.

ly sufficient opportunity and process to resolve his claim. Also, based on the deficiencies in the habeas proceeding, we should not, in this case, afford the trial court's finding on habeas almost total deference.

I discussed many of my reasons for these conclusions in my dissent in *Ex parte Briseno*, including the fact that *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), requiring a jury determination of certain issues, applies to mental retardation. Recognizing that this Court's majority holding in *Briseno* is now the law, I continue to find deficiencies in the habeas proceeding on which this Court relies in deferring to the trial court's determination and in arriving at its own conclusion.

Nowhere in Hall's habeas proceeding was there a burden of proof or standard of review enunciated. The convicting court made findings and conclusions, but we do not know under what standard of proof the court made its conclusions—preponderance of the evidence, clear and convincing evidence, or beyond a reasonable doubt. Furthermore, Hall was not provided with a live evidentiary hearing. Hall was not able to cross examine the affiants and the judge was not able to evaluate their credibility. By according almost complete deference to the trial court's determination based on the procedure used on habeas, and by reaching our own conclusions based in part on the evidence adduced by affidavit on habeas, we fail to provide a procedure that reflects the need for heightened procedural requirements in determining whether a defendant may be put to death.

I think this Court should reconsider, *sua sponte*, our determination on Hall's writ of habeas corpus and order the convicting court to conduct a live evidentiary hearing and evaluate the evidence under the preponderance of the evidence standard articulated in *Briseno*. Barring that course of action, I would find that a rational jury could have found that the significant evidence adduced in favor of a finding of mental retardation outweighed the significant evidence adduced against such finding. I would therefore find that appellant has met his burden to be granted the relief he seeks, commutation to a life sentence. Because this Court follows neither course I have laid out, I respectfully dissent.

## ON APPELLANT'S MOTION FOR REHEARING

HOLCOMB, J., dissenting.

This case is in an unusual procedural posture and was at one time both on direct appeal (on remand from the United States Supreme Court) and under consideration for appellant's state claim for habeas corpus relief. We chose to apply the record from the habeas hearing to the issue of mental retardation raised on direct appeal. We even suggested that the evidence in the habeas court, which was presented by affidavit and not by live testimony, was almost unsuitable for a proper review of the issue. This dissent, however, is not about whether I believe appellant is mentally retarded; I have no reason to believe that the habeas court was incorrect in its assessment of the evidence before it. I simply believe that we must apply the law as I see it.

In the past, I thought *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), required a jury determination, even on habeas, of a claim of mental retardation brought under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The case of *Schriro v. Summerlin*, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed. 442, though, held otherwise for cases on habeas review. However, that same holding means that an *Atkins* claim,

if still on direct appeal, is required to be considered and applied "prospectively." We have held that an *Atkins* claim is equivalent to an affirmative defense. If we believe that, then we must believe that a jury must consider the fact issue presented by this equivalent of an affirmative defense.

*Ring, Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, all stand for the proposition that a factor that increases a sentence must be found by a jury beyond a reasonable doubt. With *Atkins* we are talking about the equivalent of an affirmative defense rather than simply an increase in the sentence. A successful *Atkins* claim can *decrease* a death sentence to the only alternative, a life sentence. I believe it logically correct to say that, if the claim which would entitle a defendant to a life sentence is not considered by a jury and the decision is made by the trial court, the trial court's decision is equivalent to an *increase* in the sentence from life to death. Therefore, a jury must address the issue of mental retardation in this case.

Because this case is still *on* direct appeal and the issue of mental retardation must be addressed by a jury, this Court should remand the case for a jury determination of whether appellant's mental ability is "so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus" against their execution. *Atkins v. Virginia,* 536 U.S. at 317, 122 S.Ct. 2242. Since the majority does *not* so hold, I respectfully dissent.