IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-75,795 






EX PARTE GREGORY VAN ALSTYNE, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


IN CAUSE NO. 30,941-02-B IN THE 181
ST DISTRICT COURT


FROM POTTER COUNTY





 Keller, P.J., filed a dissenting opinion in which Keasler and Hervey, JJ.,
joined. 

 

 OPINION

 Is applicant the kind of person who is "so impaired as to fall within the range of mentally retarded
offenders about whom there is a national consensus" that the death penalty should not be imposed? (1) He
did not seem to be particularly impaired when he was interviewed by the television media. We are
fortunate to have a video recording (including audio) of that interview, and I have reviewed it. On the
recording, applicant speaks fluently. Both the content of his speech and its manner of delivery suggest a
person of ordinary intelligence. His ability to engage in abstract thinking is reflected by his use of figures
of speech (2) and by his explanation of the symbolism of the tear tattoo on his face. It is impossible to fully
convey in writing applicant's demeanor and voice, but applicant does not appear on the video to be
mentally retarded.

 The news reporter felt that applicant had communicated his points well; she had no reservations
about his mental capacity. Both of the State's experts expressed the opinion that the recording is evidence
that applicant does not have mental retardation. Indeed, Dr. Jenkins stated, "I have never seen any
mentally retarded individual communicate and interact as Gregory Van Alstyne did in the recorded
television interview." The trial court itself acknowledged that "before being educated through this writ
process, [applicant's] appearance on the televised interview is not one which this court would have thought
was indicative of mental retardation."

 We have previously addressed the effect a video recording can have on appellate review of a trial
court's finding of fact where the recording clearly contradicts testimony that would otherwise support the
trial court's finding. In Carmouche v. State, a law enforcement officer testified that the defendant had
made gestures indicating his consent to a request to conduct a search. (3) The incident had been recorded
on videotape, and the recording was inconsistent with the officer's rendition of events. (4) Finding that "the
videotape presents indisputable visual evidence contradicting the essential portions of [the officer's]
testimony," we held, "In these narrow circumstances, we cannot blind ourselves to the videotape evidence
simply because [the officer's] testimony may, by itself, be read to support" the trial court's ruling. (5)

 Carmouche suggested that it was appropriate in the situation presented to "decline to give 'almost
total deference'" to the trial court's findings because the videotape evidence did "not pivot 'on an
evaluation of credibility and demeanor.'" (6) In a later case, we suggested that this statement made our
precedent "somewhat unclear" as to whether a deferential or de novo standard applies to a trial court's
evaluation of videotape evidence in the traffic stop context. (7) Citing Anderson v. Bessemer City, (8) we
clarified that the "almost total deference" standard of review applies. (9) In a later case, Judge Hervey
explained that Carmouche presented an uncommon scenario that can result from the application of the
deferential standard of review: "Carmouche illustrates how a reviewing court can overturn a lower court's
ruling by considering all the evidence in the light most favorable to the ruling even when there is some
evidence to support the ruling." (10) Under the appropriate circumstances, a video recording can be evidence
of a compelling nature that requires that we discount testimony that conflicts with the recording.

 Such would appear to be the case before us. Although applicant proffered low IQ scores, experts
who opined that applicant was mentally retarded (despite the video), and other testimony suggesting
adaptive deficits, the video recording starkly contradicts the picture painted by applicant's evidence. 

 But the Court says we should not trust what we see and hear on the video recording, because we
are not experts, and because people suffering from mild mental retardation can sometimes wrap themselves
in a "cloak of competence." We should also keep in mind that people who are not mentally retarded can
malinger, refusing to put forth their best effort on testing and in other respects acting as if they are less
intelligent than they really are. A person whose life depends on a finding of mental retardation would have
an especially strong incentive to do so. Indeed, as the Court observes, one set of applicant's test scores
varies widely enough from the others to suggest possible malingering. Even more telling, however, is the
habeas court's own observations of applicant's conduct and demeanor at the evidentiary hearing: 

This court, based on personal observations, and prior to reading Dr. Jenkins' affidavit, was
struck by the divergent appearance of Mr. Van Alstyne in the television interview
contrasted to his appearance in court. At the evidentiary hearing, Mr. Van Alstyne had an
extremely flat affect. He did not interact with court personnel or with his counsel, showed
no emotion, and basically sat zombie-like in his seat. This is not the Gregory Van Alstyne
shown in the television interview tape. (11)


And the proceedings may be especially vulnerable to malingering, when, as in this case, very little objective
information is available about the applicant's life before age eighteen. (12) 

 It is clear that the trial court in this case carefully considered the evidence on both sides of the issue
of mental retardation. The record of the hearing, and the findings of fact and conclusions of law, reflect a
high degree of thoughtfulness and conscientiousness on the part of the court. And perhaps a factfinding
court can reasonably conclude, based on the defensive evidence offered here, that applicant can in some
sense be said to be mentally retarded under the AAMR guidelines. But is applicant impaired to such a
degree that a national consensus exists that he should not be subject to the death penalty? It is evident from
the video recording that he is not so impaired.

 Moreover, substantial evidence apart from the video recording supports the State's contention that
applicant is not mentally retarded, including expert testimony and a prior determination within the prison
system. (13) Even giving "almost total deference to the trial court's findings," (14) I cannot conclude that the
evidence is sufficient to show that applicant is impaired to the degree necessary to exempt him from
execution under Atkins v. Virginia.

 I would deny relief. I respectfully dissent. 

Delivered: November 14, 2007

Publish 
1. Atkins v. Virginia, 536 U.S. 304, 317 (2002).
2. As the trial court observed, applicant used various figures of speech such as: "fed to the lions,"
"thrown away like a piece of trash," "taken fast," "eaten alive," "sacrificed," and "putting things in God's
hands."
3. 10 S.W.3d 323, 331-32 (Tex. Crim. App. 2000).
4. Id.
5. Id. at 332.
6. Id.
7. Montanez v. State, 195 S.W.3d 101, 108 (Tex. Crim. App. 2006).
8. 470 U.S. 564 (1985).
9. Montanez, 195 S.W.3d at 109.
10. Watson v. State, 204 S.W.3d 404, 418 n.7 (Tex. Crim. App. 2006)(Hervey, J., dissenting).
11. Nevertheless, the trial court said, "[J]ust because Mr. Van Alstyne may make an effort to act
or look like what he may perceive a mentally retarded person would act or look like, does not mean that
he is not retarded."
12. Applicant had emigrated to the United States from the Philippines, and the trial court lamented
the absence of records for segments of his life.
13. When asked why applicant was discharged from the Mentally Retarded Offender Program
(MROP), an associate clinical psychologist for the Texas Department of Criminal Justice, Arden
Kuperman-Dominey, replied, "[T]he records just indicated that they said his level of adaptive functioning
was too high for their program." The MROP report stated that applicant's "intellectual functioning is in the
normal range and his adaptive behavior is also normal." Kuperman-Dominey explained that, with regard
to an inmate's suitability for the MROP program, "[t]hey usually have a whole list of things and their
functioning on that unit," and that the sociology department would be in charge of confirming the inmate's
self-reported information. According to Kuperman-Dominey, however, the majority of records, if any, had
been destroyed. Although applicant claims that the MROP determination was flawed because it was based
solely upon a Vineland score derived from his self-reporting, no one really knows whether that is indeed
the case, or whether the confirming records have simply been destroyed sometime between 1989, when
he was evaluated, and 2006, when the evidentiary hearing was held.
14. Hall v. State, 160 S.W.3d 24, 36, 39 (Tex. Crim. App. 2004).