IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 48,498-02






EX PARTE ELKIE LEE TAYLOR, Applicant








ON APPLICATION FOR A WRIT OF HABEAS CORPUS


FROM TARRANT COUNTY






 Johnson, J., concurs in the denial of relief, joined by Keasler, Hervey, and
Cochran, JJ.



C O N C U R R I N G S T A T E M E N T 



 After a jury found applicant guilty of capital murder and answered the special issues
submitted pursuant to Tex. Code Crim. Proc. art. 37.071, the trial court assessed punishment at
death. This Court affirmed applicant's conviction on direct appeal. Taylor v. State, 920 S.W.2d 319
(Tex. Crim. App. 1996).

 Applicant filed his original application for writ of habeas corpus on January 31, 2001. The
Court denied that application on March 28, 2001. On January 16, 2003, applicant filed a second
application for writ of habeas corpus that alleged that he is mentally retarded and therefore cannot
be executed. Atkins v. Virginia, 536 U.S. 304 (2002). On January 21, 2003, the Court found that the
claim in the subsequent application met the requirements for consideration under Tex. Code Crim.
Proc. art. 11.071, §5, and remanded the application to the trial court for resolution of the claim. The
trial court made findings of fact and conclusions of law, recommending that the application be
denied because applicant failed to show by a preponderance of the evidence that he is mentally
retarded. However, the trial court failed to conduct a live hearing to consider testimony regarding
evidence of applicant's purported mental retardation. 

 This Court determined that a live hearing was necessary and remanded this cause to the trial
court for a second time on March 23, 2005. After holding a live hearing, the trial court again found
that applicant failed to prove by a preponderance of the evidence that he is mentally retarded and
recommended that relief be denied.

 In Atkins, the United States Supreme Court noted that "any serious disagreement about the
execution of mentally retarded offenders . . . is in determining which offenders are in fact retarded."
Atkins, 536 U.S. at 317. The Supreme Court, however, left it to the states to develop appropriate
enforcement mechanisms to prevent the execution of such individuals. Id. As with any other claim
for habeas relief, applicant bears the burden of proving that he is mentally retarded. Ex parte
Chappell, 959 S.W.2d 627, 628 (Tex. Crim. App. 1998). 

 A person is considered mentally retarded under Texas law if he is able to demonstrate that
he meets the three prongs of the test cited in Briseno: (1) (1) "significantly subaverage general
intellectual functioning" (generally, an IQ of 70 or below); (2) "related limitations in adaptive
functioning;" and (3) onset of the first two characteristics before age eighteen. Ex parte Briseno, 135
S.W.3d 1, 7-8 (Tex. Crim. App. 2004); see also Hall v. State, 160 S.W.3d 24, 36 (Tex. Crim. App.
2004). Mental retardation is similarly defined under Tex. Health & Safety Code § 591.003(13).

 After reviewing the evidence presented in the trial record and in affidavits from applicant and
the state, the trial court adopted, with few modifications, the state's proposed findings of fact and
conclusions of law. It discussed the three prongs of the mental-retardation standard, as well as the
factors connected to these prongs, as identified in Briseno, and reviewed not only the opinions of the
experts, but also the evidence upon which the experts based their opinions when they evaluated the
level of applicant's intellectual functioning. (2) The trial court also assessed evidence of applicant's
adaptive behavioral functioning according to the guidelines delineated in Briseno.

 In support of his mental-retardation claim, applicant presented several exhibits, including
school, employment, and prison records, as well as affidavits and reports from experts who had
evaluated applicant. Applicant also presented a personal affidavit and affidavits from his brother,
sister, and aunt. The trial court found that applicant's experts had based their evaluations on
incomplete information; while applicant's experts had met with him on three separate occasions to
administer different diagnostic examinations designed to measure applicant's adaptive behavior
skills, they had failed to consider applicant's written statements, the facts of the crimes and arrest,
and the information about applicant's conduct while incarcerated. The trial court found that the
state's experts, on the other hand, had personally interviewed applicant and had reviewed all relevant
documents before concluding that, while applicant exhibits signs of borderline intellectual
functioning or even mild mental retardation, he is not so impaired as to fall within the range of
mentally retarded offenders about whom there is a national consensus regarding exemption from the
death penalty. 

 The trial-court record reflects that applicant took at least five IQ tests. The first test, the
Wechsler Intelligence Scale for Children (WISC), was administered by the State Department of
Education in Leland, Mississippi, when applicant was ten years old. Applicant's full-scale score on
this test was 75, slightly above the presumptively retarded score of 70. The examination
administrator, Dr. Leon Jackson, indicated that applicant "is presently functioning within the
borderline to dull range of normal intelligence . . ." and that variances in the sub-test scores
suggested that applicant had not put forth sufficient effort during the test and was capable of
achieving a higher score. The trial court found that Dr. Jackson's assessment of applicant's mental
abilities was accurate and that applicant's level of intellectual functioning was higher than the WISC
score indicated. 

 At age 32, applicant was given the Revised Beta II (a brief screening test) by the Texas
Department of Criminal Justice (TDCJ) and scored 63. Shortly thereafter, TDCJ administered the 
Wechsler Adult Intelligence Scale-Revised Test (WAIS-R), upon which applicant scored 69. Similar
to the WISC test, the TDCJ examiner noted that the WAIS-R score "appears to be an
underestimation of current functioning." TDCJ records seemingly corroborate these conclusions;
after a thorough examination of applicant's mental status and test results, he was deemed not to be
mentally retarded. His intellectual functioning, however, was considered to be in the "borderline"
range. The trial court found that applicant's placement in the Mentally Retarded Offenders Program
(MROP) at TDCJ was the result of a determination by prison officials that such a placement
constituted the most appropriate option, even though applicant was never diagnosed as mentally
retarded. 

 Two subsequent IQ tests were administered to applicant in preparation for trial. Those tests
show the 41-year-old applicant scoring near or below presumptive intelligence levels indicating
mental retardation. In particular, applicant achieved a full-scale score of 65 on the Wechsler Adult
Intelligence Test (WAIS-III), administered by the state's expert, and a full-scale score of 71 on the
Kaufman Adolescent and Adult Intelligence Scale, administered by applicant's expert. Among the
various tests relied upon by the trial court, only the WISC assessed applicant's intellect before age
18. The trial court found that the record lacked any formal, definitive diagnosis that applicant's
mental retardation exists and manifested itself prior to age 18. The trial court concluded, therefore,
that applicant had failed to prove by a preponderance of the evidence that his intellectual functioning
is significantly sub-average.

 The second prong of a mental-retardation claim requires analysis of applicant's adaptive-
behavior skills. Adaptive behavior refers to "the effectiveness with or degree to which a person
meets the standards of personal independence and social responsibility expected of the person's age
and cultural group." Tex. Health & Safety Code § 591.003(1). Some persons whose IQs fall
within the accepted range of mental retardation are still able to function quite well in society, while
others, whose IQs are presumptively not within the range of mental retardation, have maladaptive
behaviors to an extent that renders them unable to care for themselves adequately. The trial court,
either explicitly or implicitly, addressed six out of the seven factors outlined in Briseno. (3)

 In doing so, the trial court placed significant emphasis on the validity and credibility of the
various adaptive-behavior tests used by both the state and applicant's experts. Applicant's expert,
Dr. Denis Keyes, administered two adaptive behavior tests, the Vineland Adaptive Behavior Scale-Interview Format (VABS) and the Scale of Independent Behavior-Revised Edition (SIB-R). These
tests are designed to expose deficiencies in adaptive behavior by using a series of interviews to
analyze communication, daily living, and social skills. The trial court found that both tests are
subject to factors that detract from the overall credibility of the assessments. Notably, the trial court
found that the VABS test lacked credibility because: (1) it was not designed to have the interviewer
rate the subject's present adaptive skills against an unidentified group of people within the same age
range as the subject; (2) the test was not to be used to retrospectively rate a subject's skills to a time
when the subject was no older than 18 years and 11 months old. Similarly, the trial court found the
SIB-R results unpersuasive because the test results were based on self-reporting by applicant.

 Applicant's other expert, Dr. George Denkowski, administered the Adaptive Behavior
Assessment System (ABAS-II) and asserted that the test, which examines ten skill areas, (4) was
"highly reliable" in assessing adaptive behavior skills of potentially mentally retarded individuals. 
The trial court, however, found that a chart in the test's manual that was used to support this
proposition contained no data on the effectiveness of using ABAS-II as a diagnostic tool for
evaluating adaptive behavior skills of potentially mentally retarded individuals. 

 On the other hand, the state's expert, Dr. Randy Price, administered the Street Survival Skills
Questionnaire (SSSQ) to applicant prior to trial. The SSSQ consists of nine sub-tests which are
designed to gauge a subject's grasp of those skills necessary for independent living. (5) In a sworn
affidavit, Dr. Price stated that applicant scored 91, placing his adaptive behavior knowledge in the
"average" range. Dr. Price also concluded that while applicant exhibits "low intelligence," his
adaptive behavior "does not reveal significant deficits." The trial court found that the SSSQ was a
"superior test" for measuring adaptive behavior skills because, unlike the tests administered by
applicant's expert, the SSSQ does not rely on self-reporting by the individual being tested. Instead,
the SSSQ assesses the subject's ability to perform real-life tasks. The trial court also found the
results of the SSSQ administered by Dr. Price to be consistent with an SSSQ previously administered
by TDCJ, on which applicant scored 87. 

 The trial court also focused on applicant's actions in the days leading up to the murder, on
the evening of the murder itself, and the days following the murder in assessing his level of adaptive
functioning. In particular, the trial court found that applicant was capable of formulating and
executing a complex plan to commit murder. Before committing the instant offense, applicant
strangled an Hispanic male using a wire coat hangar after applicant's efforts to kill the victim by
manual strangulation were unsuccessful. In the instant case, applicant had previously burglarized
the home of the victim and was sentenced to prison for that crime. Applicant harbored a grudge
against the burglary victim and told his friends that, upon release, he would seek revenge against the
individuals who he perceived to be responsible for his incarceration. In committing this murder,
applicant again used a wire coat hangar to strangle the victim, and he subsequently bragged to his
friends and a prostitute about committing both the instant murder and the murder of an Hispanic
male on a previous occasion. Applicant's own expert testified that applicant was more efficient in
the commission of the second murder and that applicant's decision to forego using his bare hands
in favor of a wire coat hangar offered insight into the level of applicant's adaptive functioning. 

 Additionally, when confronted by police shortly after committing the murder, applicant
fabricated a story about stealing a television from an abandoned house in an attempt to disclaim
responsibility for the murder. Applicant also paid a prostitute to act as his alibi and, after the murder,
applicant accepted responsibility for the crime. When applicant's girlfriend expressed skepticism
about applicant's ability to commit murder, he sought corroboration from his accomplice. After he
was arrested, applicant attempted to deny his leadership role in the murder by shifting blame for the
murder to his accomplice. The trial court found that these actions demonstrated applicant's ability
to hide facts or lie in furtherance of his own self-interest. 

 Finally, the trial court also considered applicant's behavior while incarcerated. Prison
employees described applicant in affidavits as "a good faker . . . who was no different than any of
the other inmates," and as one who was capable of conforming his behavior to meet basic rules and
requests of prison officials. The affidavits also suggest that applicant understood the consequences
of negative behavior. The trial court reasoned, therefore, that applicant was capable of conforming
his conduct to the accepted adult standard of behavior which prohibits the commission of murder. 
The trial court concluded, consistent with the guidelines issued in Briseno, that applicant's actions,
especially before, during, and after the murder showed significant intellect. Consequently, the trial
court determined that applicant had not demonstrated by a preponderance of the evidence that he had
related limitations in adaptive functioning.

 Because the trial court did not find applicant to be mentally retarded, it did not discuss the
age of onset except to note that applicant and his family members attributed conflicting levels of
mental ability to applicant. A review of family members' affidavits reveal that applicant was never
described as mentally retarded. Rather, the affidavits describe applicant as "slow," prone to poor
judgment, and subject to periodic fits of anger. Furthermore, applicant himself acknowledges in an
affidavit that he suffers from a learning disability, but he is silent about the issue of mental
retardation. 

 Applicant's case is distinguishable from Atkins. Atkins was convicted on charges of
abduction, armed robbery, and capital murder. Atkins, 536 U.S. at 308. The defense relied heavily
on one witness, a forensic psychologist who had evaluated the defendant before trial and testified
at trial that the defendant had an IQ of 59 and was therefore "mildly mentally retarded." Id. at 308-09. The witness's conclusion was based on interviews with the defendant and people who knew
him, a review of school, court, and police records, and the administration of a standard intelligence
test. At sentencing, the forensic psychologist reiterated his findings and pointed out that defendant's
limited intellect was a "consistent feature throughout his life, and that his IQ score of 59 is not an
aberration . . .." Id. at 309.

 Unlike the defendant in Atkins, applicant's IQ was tested on numerous occasions as a child
and as an adult, but it was only after his conviction that applicant's mental abilities were questioned. 
The state's expert was the only individual who had fully reviewed all pertinent files and interviewed
applicant before rendering a decision about applicant's mental ability. The diagnosis, that applicant
is not mentally retarded, or in the alternative, that he is an example of a "borderline" case, is
supported by the evaluations of Dr. Jackson and the TDCJ. The trial court accepted the validity of
the WISC test upon which applicant scored 75 and concluded that the other tests did not accurately
reflect applicant's mental ability. Moreover, mental retardation manifests itself during the
developmental stages of growth, and unlike the defendant in Atkins, applicant's alleged mental
retardation was not a "consistent feature" throughout his life; although applicant was always
perceived to be "slow," his alleged mental retardation was not raised until after he was sentenced to
death. 

 The findings of fact and conclusions of law made by the trial court are supported by the
record and are not clearly erroneous. I therefore concur in the denial of relief.


 Johnson, J.



Filed: February 1, 2006

Do not publish 
1. "This Court has previously employed the definitions of 'mental retardation' set out by the American
Association on Mental Retardation (AAMR), and that contained in section 591.003(13) of the Texas Health and
Safety Code." Briseno, at 7.
2. The testimony and affidavits of the various expert witnesses conflicted as to whether applicant is mentally
retarded.
3. The Briseno Court weighed the following factors as indicative of mental retardation: (1) did those who
knew the person best during the developmental stage, his family, friends, teachers, employers, authorities, think he
was mentally retarded at that time, and if so, act in accordance with that determination; (2) has the person formulated
plans and carried them through, or is his conduct impulsive; (3) does his conduct show leadership, or does it show
that he is led around by others; (4) is his conduct in response to external stimuli rational and appropriate, regardless
of whether it is socially acceptable; (5) does he respond coherently, rationally, and on point to oral or written
questions, or do his responses wander from subject to subject; (6) can the person hide facts or lie effectively in his
own or others' interests; and (7) putting aside any heinousness or gruesomeness surrounding the capital offense, did
the commission of that offense require forethought, planning, and complex execution of purpose? Briseno, at 8-9.
4. The Adaptive Behavior Assessment System (ABAS-II) measures the following set of skills: (1)
communication; (2) self-care; (3) social skills; (4) work skills; (5) self-direction; (6) community use; (7) home living;
(8) health and safety; (9) leisure; (10) functional academics.
5. The Street Survival Skills Questionnaire (SSSQ) examines the following nine areas: (1) understanding and
telling time; (2) recognizing and understanding the function of tools; (3) basic concepts; (4) functional signs; (5)
domestic skills; (6) health and safety; (7) public services; (8) monetary skills; (9) measurement skills.